1   LABONI HOQ (SBN 224140)
    lhoq@advancingjustice-la.org
2   CHRISTOPHER LAPINIG (SBN
    802525)
3   clapinig@advancingjustice-la.org
    ASIAN AMERICANS
4   ADVANCING JUSTICE-LOS
    ANGELES
5   1145 Wilshire Blvd.
    Los Angeles, California 90017
6   Telephone:   (213) 977-7500
    Facsimile:   (213) 977-7595
7
    MARWA RIFAHIE (SBN 280777)
8   mrifahie@cair.com
    PATRICIA SHNELL (SBN 316183)
9   pshnell@cair.com
    COUNCIL ON AMERICAN-ISLAMIC
10  RELATIONS–CA
    2180 W. Crescent Avenue, Suite F
11  Anaheim, California 92801
    Telephone:   (714) 776-1177
12  Facsimile:   (714) 399-4585

    PETER BIBRING (SBN 223981)
    PBibring@aclusocal.org
    MOHAMMAD TAJSAR (SBN 280152)
    MTajsar@aclusocal.org
    ACLU FOUNDATION OF
    SOUTHERN CALIFORNIA
    1313 West Eighth Street
    Los Angeles, California 90017
    Telephone:   (213) 977-9500
    Facsimile:   (213) 977-5299

    ANJAN CHOUDHURY (SBN 236039)
    anjan.choudhury@mto.com
    ELIZABETH A. KIM (SBN 295277)
    elizabeth.kim@mto.com
    SUSAN S. HAR (SBN 301924)
    susan.har@mto.com
    MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, Fiftieth Flr.
    Los Angeles, California 90071-3426
    Telephone:   (213) 683-9100
    Facsimile:   (213) 687-3702

13  Attorneys for Plaintiffs

14              UNITED STATES DISTRICT COURT

15      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

16

17  COUNCIL ON AMERICAN-ISLAMIC        Case No.
18  RELATIONS–CA; VIGILANT LOVE
    COALITION; ASIAN AMERICANS
19  ADVANCING JUSTICE-LOS              **COMPLAINT**
    ANGELES; AMERICAN CIVIL
20  LIBERTIES UNION OF SOUTHERN
    CALIFORNIA,
21
             Plaintiffs,
22
        vs.
23
    FEDERAL EMERGENCY
24  MANAGEMENT AGENCY; UNITED
    STATES DEPARTMENT OF
25  HOMELAND SECURITY; UNITED
    STATES DEPARTMENT OF
26  HOMELAND SECURITY LONG
    BEACH FIELD OFFICE; UNITED
27  STATES DEPARTMENT OF
    HOMELAND SECURITY LOS
28  ANGELES FIELD OFFICE; FEDERAL

1 | BUREAU OF INVESTIGATION LOS
2 | ANGELES FIELD OFFICE; UNITED
3 | STATES ATTORNEY'S OFFICE FOR
THE CENTRAL DISTRICT OF
CALIFORNIA,

4 |         Defendants.

1

**INTRODUCTION**

2      1.      This action, brought by several leading civil rights and community-

3   based organizations, arises from government activities in "Countering Violent

4   Extremism" ("CVE"), a controversial federal program that purportedly seeks to

5   prevent and deter terrorism through community-based engagement.

6      2.      CVE programming potentially threatens the free exercise of First

7   Amendment rights by casting suspicion on the beliefs, associations, and expressive

8   activities of certain communities and individuals, particularly American Muslims,

9   and by tasking community members with monitoring and reporting one another to

10  government entities, including law enforcement.  Entities within the federal

11  government, including Defendants, have provided the public with little information

12  about their CVE programming.  Timely public disclosure of the requested

13  information is essential to ascertain the motivation, goals, and impact of the federal

14  government's CVE programming on the public.

15     3.      More than three months ago, on or around July 7, 2017, Plaintiffs

16  submitted to a number of federal agencies a request (the "Request") pursuant to the

17  Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  The Request seeks to

18  uncover information about the government's CVE activities, which to date remain

19  shrouded in secrecy.  Plaintiffs know that the government has a significant number

20  of documents responsive to the Request including, but not limited to, applications

21  submitted by nonprofit organizations, state and local government agencies, and

22  educational institutions for a CVE grant program (the "CVE Grant Program")

23  recently launched by the federal government.  It also has documents related to the

24  list of recipients who were awarded grants by the current administration, which

25  supersedes a different list of grantees awarded by the previous administration.

26  Nevertheless, Defendants have utterly failed to acknowledge or respond to the

27  Request, in violation of FOIA and its implementing regulations.

28

4. Plaintiffs seek declaratory, injunctive, and other appropriate relief with respect to Defendants' responses to the Request.

## JURISDICTION AND VENUE

5. This Court has both subject matter jurisdiction over the FOIA claims asserted here and personal jurisdiction over the parties to this action pursuant to 5 U.S.C. § 552(a)(4)(B) and § 552(a)(6)(E)(iii). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06.

6. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

7. Plaintiff Council on American-Islamic Relations–CA, Greater Los Angeles Office ("CAIR-LA") is the Los Angeles office of a nonprofit, grassroots civil rights and advocacy organization with an office in the greater Los Angeles area. CAIR-LA is the local chapter of CAIR California and is part of America's largest national Muslim civil liberties organization. CAIR seeks to enhance understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims, and build coalitions that promote justice and mutual understanding. Consistent with its mission, CAIR-LA opposes domestic policies that permit racial, ethnic, or religious profiling. On multiple occasions, CAIR has made known its concerns about the negative impact of CVE programs, including the improper characterization of American Muslims as a suspect community and the furtherance of ongoing abusive surveillance and monitoring practices, particularly of mosques and American Muslims in the Los Angeles area. CAIR-LA uses state and federal public records laws to obtain information concerning government activities that may adversely affect the communities that it serves.

8. Plaintiff Vigilant Love Coalition is a community-based grassroots coalition of allies using the power of solidarity and #VigilantLOVE to actively defend the safety and justice of the communities and individuals affected by Islamophobia in the greater Los Angeles area. Given Vigilant Love Coalition's

mission, membership, and efforts, it is particularly concerned with the negative impacts of the involvement of local government officials and agencies in the highly controversial CVE programs that, *inter alia*, characterize members of the American Muslim communities as "violent extremists" and may fuel the very Islamophobia that the Vigilant Love Coalition works to combat.

9.     Plaintiff Asian Americans Advancing Justice – Los Angeles ("Advancing Justice-LA") is a 501(c)(3) nonprofit organization whose mission is to advocate for civil rights, provide legal services and education, and build coalitions to positively influence and impact Asian Americans, Native Hawaiians, and Pacific Islanders and to create a more equitable and harmonious society.  Founded in 1983 as the Asian Pacific American Legal Center, Advancing Justice-LA serves more than 15,000 individuals and organizations every year through direct services, impact litigation, policy advocacy, leadership development, and capacity building.  In support of its mission, Advancing Justice-LA uses state and federal public records laws to obtain information concerning government activities that may adversely affect the communities that it serves.  On multiple occasions, Advancing Justice-LA has publicly raised its concerns about the negative impact of CVE programs on communities across the country, including their stigmatizing impact on targeted Muslim communities and their potential threat to religious exercise and political expression by tasking community members with monitoring and reporting on supposed "radical" and "suspicious" thought and behavior to law enforcement.

10.     Petitioner American Civil Liberties Union Foundation of Southern California ("ACLU SoCal") is a nonprofit, nonpartisan organization under the laws of the state of California with over 120,000 members.  As an affiliate of the national American Civil Liberties Union, ACLU SoCal is dedicated to the principles of liberty and equality embodied in the both the United States and California constitutions and our nations' civil rights laws.  ACLU SoCal is committed to principles of transparency and accountability and uses state and federal public

records laws to ensure that the public is informed about the conduct of government officials.  ACLU SoCal uses such records to compile information for publication in reports published in hard copy and distributed electronically through its website, in amicus briefs, in legislative and public advocacy efforts, and in litigation.  On multiple occasions, ACLU SoCal has publicly raised its concerns about the negative impact of CVE programs on communities both in Greater Los Angeles and nationwide, including their stigmatizing impact on targeted Muslim communities and their potential threat to religious exercise and political expression by tasking community members with monitoring and reporting on supposed "radical" and "suspicious" thought and behavior to law enforcement, as discussed *infra*.

11.    Defendant Federal Emergency Management Agency ("FEMA") is a component of DHS and is an establishment in the executive branch of the government and therefore an agency within the meaning of 5 U.S.C. § 552(f)(1).  FEMA is responsible for building, sustaining, and strengthening the country's "capability to prepare for, protect against, respond to, recover from and mitigate all hazards."  FEMA, *About the Agency*, https://www.fema.gov/about-agency.  FEMA is also involved in administering the CVE Grant Program.

12.    Defendant U.S. Department of Homeland Security ("DHS") is a department of the executive branch of the United States and is an agency within the meaning of 5 U.S.C. § 552(f)(1).  DHS is responsible for guarding against terrorism, securing U.S. borders, enforcing U.S. immigration laws, and responding to disasters.  DHS and its components have been leading the administration and implementation of the CVE Grant Program.

13.    Defendant DHS Los Angeles Field Office ("DHS Los Angeles") is located at 300 North Los Angeles Street, Los Angeles, California 90012.  DHS Los Angeles is one of DHS's main field offices in Greater Los Angeles, one of the areas selected by the U.S. Department of Justice ("DOJ") as a CVE pilot region, as discussed *infra*.

14. Defendant DHS Long Beach Field Office ("DHS Long Beach") is located at 501 West Ocean Boulevard, Long Beach, California 90802. DHS Long Beach is one of DHS's main field offices in Greater Los Angeles, one of the areas selected by DOJ as a CVE pilot region, as discussed *infra*.

15. Defendant Federal Bureau of Investigation ("FBI") Los Angeles Field Office ("FBI Los Angeles") is located at 11000 Wilshire Boulevard, Suite 1700, Los Angeles, California 90024. FBI Los Angeles is the FBI's main office in Greater Los Angeles, one of the regions selected by DOJ as a CVE pilot region, as discussed *infra*.

16. Defendant United States Attorney's Office for the Central District of California ("U.S.A.O., C.D. Cal.") is located at 300 N. Los Angeles Street, 7th Floor, Los Angeles, California 90012. As the U.S. Attorney's Office in Greater Los Angeles, one of the regions selected by DOJ as a CVE pilot region, U.S.A.O., C.D. Cal., has been heavily involved in CVE programming in the region, as discussed *infra*.

## STATUTORY FRAMEWORK

17. The Freedom of Information Act, 5 U.S.C. § 552, mandates disclosure of records held by a federal agency in response to a request for such records by a member of the public, unless those records fall within one of nine narrow statutory exemptions.

18. The basic purpose of FOIA is to enable the public to hold the government accountable for its actions, through transparency and public scrutiny of governmental operations and activities. By providing access to government information, FOIA helps the public better understand the government, thereby enabling a vibrant and functioning democracy.

19. Any member of the public may make a request under FOIA for records to an agency of the United States. An agency that receives a FOIA request must notify the requestor within twenty business days after the receipt of the request. 5

U.S.C. § 552(a)(6)(A)(i).  In its response, the agency must inform the requestor whether or not it intends to comply with the request, provide reasons for its determination, and inform the requestor of his or her right to appeal the determination.  *Id.*

20.   FOIA requires an agency to make a reasonable search for responsive records.  *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980).

21.   FOIA requires an agency to timely disclose all records responsive to a FOIA request that do not fall within one of nine narrowly construed statutory exemptions.  5 U.S.C. §§ 552(a)(3)(A), 552(b)(1)-(9).

22.   A FOIA requestor is deemed to have exhausted his or her administrative remedies if the agency fails to comply with the statutory time limits for responding to a request.  5 U.S.C. § 552(a)(6)(C)(i).  At that point, the requestor may immediately file suit in federal court to obtain the requested documents.  *Kelly v. U.S. Census Bureau*, 540 F. App'x 749, 750 (9th Cir. 2013) (unpublished) (noting that "person is deemed to exhaust administrative remedies if the agency fails to respond to a request under applicable time limits"), *as amended on denial of reh'g* (Dec. 9, 2013).

23.   A district court has jurisdiction to enjoin the agency from withholding records, to order production of records that are subject to disclosure, and to grant a public interest fee waiver of any costs associated with the production of such records.  5 U.S.C. §§ 552(a)(4)(B), 552(a)(4)(A)(iii).

24.   Documents shall be furnished without charge or at a reduced charge if disclosure of the information is in the public interest because it "is likely to contribute significantly to public understanding of the operations or activities of the government" and is "not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).  Requests for fee waivers are to be "liberally construed in favor of waivers for noncommercial requesters."  *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 432 F.3d 945, 947 (9th Cir. 2005) (citations omitted).

25.     A requestor may also seek a waiver of search and review fees on the grounds that the requestor is a "representative of the news media" and the records are not sought for a commercial purpose. *See* 5 U.S.C. § 552(a)(4)(A)(ii).  A representative of the news media is "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id.*

26.     A FOIA requestor who has been denied records or a waiver of fees associated with the search and production of records may appeal such denials to the agency.  The agency must make a determination on the appeal within twenty business days of receipt of the appeal.  5 U.S.C. § 552(a)(6)(A)(ii).

27.     FOIA also requires an agency to produce records on an expedited basis when there is a "compelling need" for expedition.  5 U.S.C. § 552(a)(6)(E)(i).  A compelling need is established if a person "primarily engaged in disseminating information" shows an "urgency to inform the public concerning actual or alleged Federal Government activity."  5 U.S.C. § 552(a)(6)(E)(v)(II); *accord* 28 C.F.R. § 16.5(e)(1)(ii) (DOJ regulations); 6 C.F.R. § 5.5(e)(1)(ii) (DHS regulations).  A FOIA requestor may also be entitled to expedited processing on the grounds that the records sought relate to a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  28 C.F.R. §16.5(e)(1)(iv) (DOJ regulations).

## FACTUAL BACKGROUND

### Background of Federal CVE Activities

28.     Based on the purported goal of preventing violent extremists and their supporters from inspiring, radicalizing, financing, or recruiting individuals or groups in the United States to commit violent acts, the federal government has adopted and endorsed CVE programming as a counter-terrorism measure.  Although in some instances CVE programs may direct targeted individuals to mental health or other services, they more generally rely on ill-conceived methodologies for identifying

"radicalization" that chill First-Amendment protected activity.  On information and belief, CVE programs may call on community members to act as a conduit for law enforcement surveillance of "radical" and "suspicious" thought and behavior within their own communities.

29.    The federal government began publicly considering CVE activities in 2011.  In August 2011, the White House made public the National Strategy for Empowering Local Partners to Prevent Violent Extremism in the United States.  The strategy emphasized that "[p]rotecting American communities from al-Qa'ida's hateful ideology is not the work of the government alone" and that "[c]ommunities – especially Muslim American communities whose children, families and neighbors are being targeted for recruitment by al-Qa'ida – are often best positioned to take the lead because they know their communities the best."  The strategy further recognized that Muslim American communities have previously "worked with law enforcement to help prevent terrorist attacks and forged creative programs to protect their sons and daughters from al-Qa'ida's murderous ideology."

30.    In September 2011, the White House announced a strategic implementation plan detailing how it would put into action the national strategy it had released the previous month.  The plan described federal support for "empowering local stakeholders to build resilience against violent extremism" and "preventative programming."  The plan further noted that the federal government will "prioritize preventing violent extremism and terrorism that is inspired by al-Qa'ida and its affiliates and adherents."  The plan identified an "overarching goal of preventing violent extremists and their supporters from inspiring, radicalizing, financing or recruiting individuals or groups in the United States to commit acts of violence" and expressed support for "community-led efforts to build resilience to violent extremism" and "preventative programming."

31.    In September 2014, then-Attorney General Eric Holder announced a "series of pilot programs in cities across the country to bring together community

1  representatives, public safety officials and religious leaders to counter violent

2  extremism."  U.S. Dep't of Justice, *Attorney General Holder Announces Pilot*

3  *Program to Counter Violent Extremists* (Sept. 15, 2014),

4  https://www.justice.gov/opa/pr/attorney-general-holder-announces-pilot-program-

5  counter-violent-extremists.  The announcement said it was launching a new CVE

6  pilot program as a response to "the emergence of groups like ISIL, and the

7  knowledge that some Americans are attempting to travel to countries like Syria and

8  Iraq."  *Id.*  Adding to the existing work of law enforcement agencies like the FBI

9  and INTERPOL to identify "foreign fighters in Syria and Iraq" and "American

10  extremists," the CVE pilot aimed to "bring together community representatives,

11  public safety officials, religious leaders, and United States Attorneys to improve

12  local engagement; to counter violent extremism; and—ultimately—to build a broad

13  network of community partnerships to keep our nation safe."  *Id.*  The program was

14  to be run in partnership with the White House, DHS, and the National

15  Counterterrorism Center.  *Id.*  The pilot program was initially implemented in

16  Boston, Minneapolis-St. Paul, and Los Angeles.  U.S. Dep't of Justice, *Pilot*

17  *Programs Are Key to Our Countering Violent Extremism Efforts* (Feb. 18, 2015),

18  https://www.justice.gov/archives/opa/blog/pilot-programs-are-key-our-countering-

19  violent-extremism-efforts.

20       32.    On information and belief, DHS, DOJ, FBI, and the U.S. Department

21  of State formed official offices for CVE in early 2015.

22       33.    In February 2015, the White House held a three-day summit on CVE

23  "to bring together local, federal, and international leaders – including President

24  Obama and foreign ministers – to discuss concrete steps the United States and its

25  partners can take to develop community-oriented approaches to counter hateful

26  extremist ideologies that radicalize, recruit or incite to violence."  The White House,

27  *FACT SHEET: The White House Summit on Countering Violent Extremism* (Feb.

28

18, 2015), https://obamawhitehouse.archives.gov/the-press-office/2015/02/18/fact-sheet-white-house-summit-countering-violent-extremism.

34.     In its announcement concerning the summit, the White House also announced a number of new steps in its CVE programming, including the expansion of "on-the-ground dedicated [DHS] staff to facilitate information sharing, engagement with local partners, strengthening of community and law enforcement partnerships, and the local establishment of prevention and intervention frameworks" to municipalities across the country and "a joint DHS and DOJ symposium for local partners to collaborate and share best practices on intervention and prevention framework development and implementation in 2015."  *Id.*

35.     The White House also announced that it would seek "$15 million in appropriated funding for the DOJ to support community-led efforts to build resilience and counter violent extremism in the President's Budget for Fiscal Year 2016."  *Id.*

### Origin of the CVE Grant Program

36.     Plaintiffs filed their Request to uncover the facts behind the federal government's CVE Grant Program, particularly to get an understanding of the types of CVE programs the federal government supports, as well as those programs it has decided not to support.

37.     In December 2015, prompted by appropriation requests from the White House, Congress allocated $10 million for DHS's Office of Community Partnerships to administer the CVE Grant Program—specifically, to "provide[] on a competitive basis directly to states, local governments, tribal governments, nonprofit organizations, or institutions of higher education" to "prepare for, prevent, and respond to emergent threats from violent extremism."  As a condition of funding, programs were to be evaluated using "individual performance measures that will measure [their] success."

38.     FEMA has been tasked with, *inter alia*, administering the CVE Grant Program, soliciting and evaluating applications, and monitoring the program.  In July 2016, DHS posted a "Notice of Funding Opportunity" ("NOFO") for the Fiscal Year 2016 CVE Grant Program.  The NOFO solicited applications—to be submitted no later than September 6, 2016—from states, local governments, tribal governments, nonprofit organizations, and higher education institutions.  The NOFO further provided, "Applications which describe programs[,] projects or activities which do not appropriately protect privacy, civil rights or civil liberties will be deemed ineligible for funding."

**CVE Grant Program Awards Announced, Then Amended**

39.     On January 13, 2017, the DHS Office of the Press Secretary released a "Statement by Secretary Jeh Johnson Announcing First Round of DHS's Countering Violent Extremism Grants" ("January 13 Statement"), identifying thirty-one grantees.  The only grantee mentioned by name in the January 13 Statement was Life After Hate, described as "an organization devoted to the rehabilitation of former neo-Nazis and other domestic extremists in this country."  A copy of the January 13 Statement is attached here as Exhibit 1.

40.     Seven days later, on January 20, 2017, the present administration assumed office.

41.     In February 2017, Reuters reported that the "Trump administration wants to revamp and rename a U.S. government program designed to counter all violent ideologies so that it focuses solely on Islamist extremism."  Julia Edwards Ainsley *et al.*, *Exclusive: Trump to focus counter-extremism program solely on Islam – sources*, Reuters (Feb. 1, 2017), http://www.reuters.com/article/us-usa-trump-extremists-program-exclusiv/exclusive-trump-to-focus-counter-extremism-program-solely-on-islam-sources-idUSKBN15G5VO.  "The program, 'Countering Violent Extremism,' or CVE, would be changed to 'Countering Islamic Extremism' or 'Countering Radical Islamic Extremism,' the sources said."  *Id.*

42.     The administration ultimately chose not to rebrand the CVE program. However, on June 23, 2017, the DHS Office of the Press Secretary released a statement titled "DHS Awards Grants to Counter Terrorist Recruitment and Radicalization in the U.S." ("June 23 Statement").  The June 23 Statement provided a hyperlink to a new list of twenty-six grantees under the CVE Grant Program ("June 23 List").  This June 23 List superseded the list of grantees provided in the January 13 Statement.

43.     The list of grantees linked in the June 23 Statement differed significantly from the list of grantees provided in the January 13 Statement.

44.      First, eleven grantees identified in the January 13 Statement were omitted in the June 23 List, suggesting that the awards to these grantees had been rescinded.  These grantees were:

        a.  Claremont School of Theology;

        b.  Coptic Orthodox Charities;

        c.  Ka Joog Nonprofit Organization;

        d.  Leaders Advancing and Helping Communities;

        e.  Life After Hate Inc.;

        f.  Music in Common;

        g.  Muslim American Leadership Alliance;

        h.  Muslim Public Affairs Council Foundation;

        i.  Project Help Nevada, Inc.;

        j.  The University of North Carolina at Chapel Hill; and

        k.  Unity Productions Foundation.

45.     News reports indicate that the current administration withdrew the CVE grants previously awarded to Muslim Public Affairs Council, Life After Hate Inc., and the University of North Carolina at Chapel Hill.  *See, e.g.*, Daniel Lippman, *DHS halts planned funding for anti-white extremism group*, Politico (June 23,

2017), http://www.politico.com/story/2017/06/23/playbook-dhs-extremism-life-after-hate-239889.

46.     News outlets also reported that several groups declined to accept their CVE grants.  *See, e.g.*, Stephen Montemayor, *Homeland Security announces two counterextremism grants for Minnesota*, Star Tribune (June 24, 2017), http://www.startribune.com/homeland-security-announces-two-extremism-grants-for-minnesota/430455753/ (reporting that Ka Joog declined to accept CVE grant).

47.     Second, the June 23 List suggested that one of two grants to the City of Los Angeles, Mayor's Office of Public Safety, listed in the January 13 Statement had been withdrawn.

48.     Third, the June 23 List indicated that the grant amounts for nine grantees had been increased, as compared to the grant amounts specified in the January 13 Statement, as follows:

>       a.  City of Houston, Mayor's Office of Public Safety & Homeland Security (from $400,000 to $500,000);
>       b.  Crisis Intervention Center of Houston, Inc. (from $400,000 to $500,000);
>       c.  Denver Police Department (from $240,000 to $481,313);
>       d.  Global Peace Foundation (from $150,000 to $453,497);
>       e.  Heartland Democracy Center (from $165,435 to $423,340);
>       f.  Las Vegas Metropolitan Police Department (from $425,000 to $500,000);
>       g.  Masjid Muhammad, Inc. (from $450,000 to $531,195);
>       h.  Police Foundation (from $463,185 to $484,835); and
>       i.  Tuesday's Children (from $147,154 to $386,670).

49.     Fourth, the June 23 List included seven new grantees that had not been identified in the January 13 Statement:

>       a.  Alameda County Sheriff's Office;

b. Hennepin County Sheriff's Office;

c. Massachusetts Executive Office of Public Safety and Security;

d. Nashville International Center for Empowerment;

e. National Governors Association (NGA) Center for Best Practices;

f. Seattle Police Department; and

g. University of San Diego.

### Plaintiffs' Public Opposition to CVE Programming

50.     Since the announcement of Los Angeles as one of the three host regions of the CVE pilot program, civil rights and community groups in Los Angeles, including Plaintiffs, have publicly discussed potential problems, including the civil liberties implications, with CVE programming.

51.     In November 2014, a coalition of civil rights and community-based organizations, including several of Plaintiffs here, published an open letter to DHS expressing "grave concerns regarding the government's proposed Countering Violent Extremism (CVE) programs," especially pertaining to "the obvious civil liberties implications on members of our communities."  Advancing Justice-LA, *LA-Based Groups Serving American Muslim Communities Question Federal 'Countering Violent Extremism' Programs as Ineffective, Stigmatizing* (Nov. 13, 2014) ("Coalition Letter") (attached as Exhibit 2).  The Coalition Letter noted that "the government has failed to provide us or the communities we serve with any meaningful details about the CVE programs."  *Id.*; *accord* Victoria Kim, *L.A. groups criticize White House program on homegrown extremism*, L.A. Times (Nov. 13, 2014), http://beta.latimes.com/local/lanow/la-me-ln-la-groups-criticize-homegrown-extremism-program-20141113-story.html.

52.     Although CVE programs may apply a public health approach towards preventing ideologically motivated violence, they continue to incorporate law enforcement oversight and partnership and task community members with monitoring and reporting "radical" or "suspect" expression and behavior to law

enforcement.  This approach has the potential to chill First-Amendment-protected activities, such as religious worship, political activism, and expression of ideological beliefs, because CVE programs frame these activities as potential indicators or predictors of violence.

53.     CVE programs also have a stigmatizing impact on targeted American Muslim communities by viewing them as inherently suspect.  The primary target of federal CVE efforts to date has been American Muslim communities, reinforcing the existing prejudices that such communities are associated with terrorism and violence and tacitly condoning intolerance.

54.     There is a lack of credible authority that CVE is actually effective as an anti-terrorism tool.  Studies show that violent threats cannot be predicted by any religious, ideological, ethnic, or racial profiling.  Thus, even if CVE programs were expanded to target other communities, the same concerns would remain, to the extent the programs continued to rely on racial, ethnic, religious, or ideology-based indicators.

**Plaintiffs' California Public Records Act Requests**

55.     In August 2015, in the wake of the White House's summit on CVE and amidst the City of Los Angeles' (the "City") continued participation in the CVE pilot program, a coalition of Southern California civil rights organizations, including Advancing Justice-LA, CAIR-LA, and ACLU SoCal, submitted a request under the California Public Records Act ("PRA"), Cal. Gov. Code § 6250 *et seq*., to the Mayor's Office and other City agencies demanding greater transparency about the extent and nature of the City's CVE activities.  The City produced only a handful of documents and failed to produce any documents concerning the City's CVE Framework, including records relating to individuals "deemed to be on a path towards violent extremism."

56.     On or around February 7, 2017, Plaintiffs submitted another PRA request to City agencies, renewing its August 2015 PRA request and requesting

records concerning, *inter alia*, funding for CVE programming; the involvement of community partners in CVE activities; and RENEW, a CVE program operated by the Los Angeles Police Department in partnership with FBI's Joint Terrorism Task Forces, the Joint Regional Intelligence Center, and mental health and social services providers.

57.     After seven months of negotiations with the City, the City failed to produce records in compliance with its obligations under the PRA.  For instance, the Los Angeles Police Department and the City's Human Relations Commission—both well known for being heavily involved in the development of CVE programs in L.A.—largely failed to provide any documents at all.

58.     As of the date of the filing of this Complaint, Plaintiffs have yet to receive a full and complete response from the City.

**Plaintiffs' FOIA Request**

59.     On or around July 7, 2017, shortly after DHS released its June 23 Statement, Plaintiffs mailed their Request to the following federal government agencies, including certain of their components and field offices: DHS, including its Privacy Office and Los Angeles field offices; DOJ, including the Office of Community Oriented Policing Services, Office of Information Policy, and Office of Justice Programs; FBI, including its Los Angeles field office; and FEMA.  A copy of the Request is attached here as Exhibit 3.

60.     On or around September 25, 2017, Plaintiffs mailed their Request to U.S.A.O., C.D. Cal.

61.     Plaintiffs' Request seeks information about the federal CVE Grant Program.  The Request seeks all records which were prepared, received, collected, and/or maintained by any of the agencies listed in the Complaint, including, *inter alia*:

> a.   Communications with all entities that considered submitting and/or did submit applications to the CVE Grant Program;

b.  Grant applications submitted to the CVE Grant Program;

c.  Records pertaining to the evaluation of applications submitted;

d.  Records pertaining to the "policy review of the CVE Grant Program" mentioned in the June 23 Statement;

e.  Records pertaining to the re-evaluation of applications and any other changes made to the CVE Grant Program by the current administration;

f.  Records pertaining to changes made to the list of grantees, as described in paragraphs 39 through 49 above; and

g.  Communications with CVE experts, state and local law enforcement, and other entities outside the federal government concerning the CVE Grant Program.

**Plaintiffs' Request for Expedited Processing**

62.  Plaintiffs' Request seeks expedited processing because it implicates matters of public urgency, namely, the nature and extent of the federal government's surveillance of American citizens, religious institutions, community groups, and other persons in the United States in the name of national security.

63.  In connection with their request for expedited processing, Plaintiffs also explained that they are primarily engaged in disseminating information to the public.  For example, Advancing Justice-LA distributes newsletters, action alerts, and news updates and maintains a website and social media accounts that publish information of public concern at no charge.

64.  Plaintiffs further explained in their Request that the records they seek relate to matters of widespread and exceptional media interest, as evidenced by articles and broadcast news concerning the CVE Grant Program and changes that the administration made to the list of grantees.  Plaintiffs identified a number of both regional and national news sources that covered the CVE Grant Program, including the Los Angeles Times, Washington Post, and New York Times.  Since Plaintiffs

1   have served their Request, media coverage of the CVE Grant Program has

2   continued.  *See, e.g.*, Ron Nixon and Eileen Sullivan, *Revocation of Grants to Help*

3   *Fight Hate Under New Scrutiny After Charlottesville*, N.Y. Times (Aug. 15, 2017),

4   https://www.nytimes.com/2017/08/15/us/politics/right-wing-extremism-

5   charlottesville.html?_r=0.

6       65.    Each Defendant has failed to acknowledge or respond to Plaintiffs'

7   Request.  Each Defendant has therefore failed to issue any determination on

8   Plaintiffs' request for expedited processing.

9   **Plaintiffs' Fee Waiver Request**

10      66.    In their Request, Plaintiffs seek a waiver of all search, review, and

11  duplication fees on the ground that disclosure of the requested records is "in the

12  public interest because it is likely to contribute significantly to public understanding

13  of the operations or activities of the government and is not primarily in the

14  commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii); *see* 6 C.F.R.

15  § 5.11(k)(1) (DHS regulations); 28 C.F.R. § 16.10(k)(1) (DOJ regulations).

16  Plaintiffs are nonprofit organizations that intend to disseminate the information they

17  seek in the Request to the public at no cost.

18      67.    Plaintiffs also seek a waiver of all search, review, and duplication fees

19  on the grounds that Plaintiffs qualify as "representative[s] of the news media" and

20  that the records sought are not for commercial use.  5 U.S.C. § 552(a)(4)(A)(ii); *see*

21  6 C.F.R. § 5.11(b)(6) (DHS regulations); 28 C.F.R. § 16.10(b)-(d)(1) (DOJ

22  regulations).  Plaintiffs are representatives of the news media because they gather

23  information of potential interest to the public, use their editorial skills to turn the

24  raw materials into a distinct work, and distribute that work to an audience.

25      68.    Plaintiffs' Request alone demonstrates that their attempt to collect and

26  disseminate information regarding the CVE Grant Program meets the requirements

27  for a fee waiver.  Nonetheless, each Defendant has failed to respond to Plaintiffs'

28  Request, and therefore has yet to decide whether Plaintiffs are entitled to a fee

1   waiver.  Plaintiffs have therefore administratively exhausted this issue prior to filing

2   this action.

### Defendants' Failure to Respond

### FEMA

69.    FEMA received the Request on or about July 11, 2017 but has never responded to it.  As more than three months have elapsed since FEMA received the request with no response, Plaintiffs have exhausted their administrative remedies with respect to FEMA.  *See* 5 U.S.C. §§ 552(a)(6)(A)(i); 552(a)(6)(C)(i).

### DHS

70.    DHS received the Request on or about July 11, 2017 but has never responded to it.  As more than three months have elapsed since DHS received the request with no response, Plaintiffs have exhausted their administrative remedies with respect to DHS.  *See* 5 U.S.C. §§ 552(a)(6)(A)(i); 552(a)(6)(C)(i).

### DHS Los Angeles Field Office

71.    DHS Los Angeles received the Request on or about July 10, 2017 but has never responded to it.  As more than three months have elapsed since DHS Los Angeles received the request with no response, Plaintiffs have exhausted their administrative remedies with respect to DHS Los Angeles.  *See* 5 U.S.C. §§ 552(a)(6)(A)(i); 552(a)(6)(C)(i).

### DHS Long Beach Field Office

72.    DHS Long Beach received the Request on or about July 10, 2017 but has never responded to it.  As more than three months have elapsed since DHS Long Beach received the request with no response, Plaintiffs have exhausted their administrative remedies with respect to DHS Long Beach.  *See* 5 U.S.C. §§ 552(a)(6)(A)(i); 552(a)(6)(C)(i).

### FBI Los Angeles Field Office

73.    FBI Los Angeles received the Request on or about July 11, 2017 but has never responded to it.  As more than three months have elapsed since FBI Los

1  Angeles received the request with no response, Plaintiffs have exhausted their
2  administrative remedies with respect to FBI Los Angeles.  *See* 5 U.S.C.
3  §§ 552(a)(6)(A)(i); 552(a)(6)(C)(i).

4  **U.S.A.O., C.D. Cal.**

5  74.   U.S.A.O., C.D. Cal., received the Request on or about September 27,
6  2017 but has never responded to it.  As more than twenty days have elapsed since
7  U.S.A.O., C.D. Cal., received the request with no response, Plaintiffs have
8  exhausted their administrative remedies with respect to U.S.A.O., C.D. Cal.

9  **CLAIMS FOR RELIEF**

10  **First Claim**

11  **Violation of FOIA for Failure To Adjudicate Request for Records**

12  **(All Defendants)**

13  75.   Plaintiffs reallege and incorporate, as though fully set forth herein, each
14  and every allegation contained the above paragraphs.

15  76.   Plaintiffs made a proper FOIA request for information pertaining to
16  Defendants' involvement with, and oversight of, CVE programming.

17  77.   Each named Defendant has failed to acknowledge or respond to
18  Plaintiffs' Request.

19  78.   Defendants' failure to respond to Plaintiffs' Request violates 5 U.S.C.
20  § 552(a)(4)(A) and the regulations promulgated thereunder.

21  **Second Claim**

22  **Violation of FOIA for Failure To Adequately Search for and Promptly Release**

23  **Records**

24  **(All Defendants)**

25  79.   Plaintiffs reallege and incorporate, as though fully set forth herein, each
26  and every allegation contained the above paragraphs.

27  80.   Plaintiffs made a proper FOIA request for information pertaining to
28  Defendants' involvement with, and oversight of, CVE programming.

81.     Each named Defendant has failed to acknowledge or respond to Plaintiffs' Request.

82.     Defendants have failed to make an adequate search for records responsive to Plaintiffs' Request and failed to promptly release the responsive records sought by Plaintiffs, in violation of 5 U.S.C. § 552(a)(3)(A)-(D).

### Third Claim

### Violation of FOIA for Improper Denial of Expedited Processing

### (All Defendants)

83.     Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained the above paragraphs.

84.     Plaintiffs made a proper FOIA request for information pertaining to Defendants' involvement with, and oversight of, CVE programming.

85.     Plaintiffs are entitled to expedited processing because Plaintiffs are engaged in disseminating information to the public and the public has an urgent need to be informed about the government's CVE programming.

86.     Each named Defendant has failed to acknowledge or respond to Plaintiffs' request for expedited processing.

87.     Defendants' failure to respond constitutes a denial of Plaintiffs' request for expedited processing of the Request in violation of 5 U.S.C. § 552(a)(6)(E)(v)(II) and corresponding agency regulations.

### Fourth Claim

### Violation of FOIA for Improper Disposition of Fee Waiver Request

### (All Defendants)

88.     Plaintiffs reallege and incorporate, as though fully set forth herein, each and every allegation contained the above paragraphs.

89.     Plaintiffs made a proper FOIA request for information pertaining to Defendants' involvement with, and oversight of, CVE programming.

90.     Plaintiffs are entitled to fee waivers because they are nonprofit organizations that intend to disseminate the requested information to the public at no cost.  Plaintiffs are further entitled to fee waivers because they are acting as "representative[s] of the news media" and the records sought are not for commercial use.  5 U.S.C. § 552(a)(4)(A)(ii).

91.     Each named Defendant has failed to acknowledge or respond to Plaintiffs' Request.

92.     Defendants' failure to respond constitutes a denial of Plaintiffs' fee waiver request in violation of 5 U.S.C. §§ 552(a)(4)(A)(ii)-(iii) and corresponding agency regulations.

### PRAYER FOR RELIEF

93.     WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.     For declaratory relief declaring that Defendants' failure to properly search for and disclose the records requested by Plaintiffs is unlawful;

b.     For injunctive relief ordering Defendants to expedite processing of Plaintiffs' Request and, upon such processing, to make available the requested records to Plaintiffs;

c.     For injunctive relief ordering Defendants to grant Plaintiffs' request for a fee waiver;

d.     For Plaintiffs' reasonable attorneys' fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E) and any other applicable statute; and

For such other relief as the Court may deem just and proper.

1    DATED:  October 27, 2017          MUNGER, TOLLES & OLSON LLP
2                                          ANJAN CHOUDHURY
                                           ELIZABETH A. KIM
3                                          SUSAN H. HAR

4

5

6                                     By: _____*/s/ Anjan Choudhury*_____
                                          ANJAN CHOUDHURY
7                                     Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

 Official website of the Department of Homeland Security

 U.S. Department of Homeland Security

---

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

---

# Statement by Secretary Jeh Johnson Announcing First Round of DHS's Countering Violent Extremism Grants

**Release Date:**  January 13, 2017

For Immediate Release
Office of the Press Secretary
Contact: 202-282-8010

In 2016, Congress answered our call for federal grants, awarded and administered by the Department of Homeland Security, to support local efforts to counter violent extremism. Today, I am pleased to announce the first round of awards of these grants.

A total of 31 proposals, from various organizations in multiple communities, have been accepted to receive some part of the $10 million appropriated by Congress last year. The funding will go for activities that include intervention, developing resilience, challenging the narrative, and building capacity. The organizations approved for grants include local governments, universities, and non-profit organizations, in locations across the country such as Boston, Minneapolis, Los Angeles, Detroit, Nebraska, Houston, Illinois, New Jersey, Texas and New York City. Among the awardees are organizations devoted specifically to countering ISIL's recruitment efforts in our homeland, and Life After Hate, an organization devoted to the rehabilitation of former neo-Nazis and other domestic extremists in this country.

**Exhibit 1**
**25**

In this age of self-radicalization and terrorist-inspired acts of violence, domestic-based efforts to counter violent extremism have become a homeland security imperative. And, I know from visiting numerous communities across this country that very often the best efforts to counter violent extremism are local, tailored to a particular community. My hope is that Congress will continue to fund this type of grant activity in the future. Again, this is a homeland security imperative.

### Awardees by Category and Areas Served

### Developing Resilience

- Police Foundation - $463,185 (Boston)
- Ka Joog Nonprofit Organization – $499,998 (Minneapolis)
- Heartland Democracy Center – $165,435 (Minneapolis)
- Leaders Advancing and Helping Communities - $500,000 (Dearborn, Mich.)
- Tuesday's Children - $147,154 (Nationwide)
- Music in Common - $159,000 (Nationwide)
- Peace Catalyst International, INC - $95,000 (Nationwide)
- Coptic Orthodox Charities - $150,000 (Nationwide)

### Training and Engagement

- City of Houston, Mayor's Office of Public Safety & Homeland Security - $400,000 (Houston)
- City of Arlington, Police - $47,497 (Arlington, TX)
- Illinois Criminal Justice Information Authority - $187,877 (Illinois)
- Global Peace Foundation - $150,000 (New Jersey)
- Nebraska Emergency Management Agency - $300,000 (Nebraska)
- City of Dearborn Police Department - $51,521 (Dearborn, Mich.)
- City of Los Angeles, Mayor's Office of Public Safety - $400,000 (Los Angeles)
- Denver Police Department - $240,000 (Denver)
- National Consortium for Advanced Policing - $200,000 (Nationwide)

### Managing Interventions

- City of Los Angeles, Mayor's Office of Public Safety - $425,000 (Los Angeles)
- Crisis Intervention of Houston, Inc. - $400,000 (Houston)

**Exhibit 1**
**26**

- Las Vegas Metropolitan Police Department - $425,000 (Las Vegas)
- Life After Hate Inc. - $400,000 (Nationwide)
- Muslim Public Affairs Council Foundation - $393,800 (Nationwide)

## Challenging the Narrative

- Project Help Nevada, Inc. - $150,000 (Reno, Nev.)
- Unity Productions Foundation - $396,585 (Nationwide)
- America Abroad Media - $647,546 (Nationwide)
- Rochester Institute of Technology - $149,955 (Nationwide)
- Masjid Muhammad, Inc. - $450,000 (Nationwide)
- The University of North Carolina at Chapel Hill - $866,687 (Nationwide)
- Muslim American Leadership Alliance - $40,000 (Nationwide)

## Building Capacity

- Counter Extremism Project - $298,760 (New York)
- Claremont School of Theology - $800,000 (Los Angeles)

# # #

Keywords:  countering violent extremism (/keywords/countering-violent-extremism) , grants (/keywords/grants) , Secretary
Johnson (/keywords/secretary-johnson)

Last Published Date: January 13, 2017

**Exhibit 1
27**

# EXHIBIT 2



Building upon the legacy of the Asian Pacific American Legal Center
www.advancingjustice-la.org

| | |
|---|---|
| **PRESS RELEASE** | **CONTACT:** |
| **FOR IMMEDIATE DISTRIBUTION** | Randy Bunnao, Communications Director |
| **November 13, 2014** | Asian Americans Advancing Justice – LA |
| | 213-241-0227, rbunnao@advancingjustice-la.org |

### LOS ANGELES BASED GROUPS SERVING AMERICAN MUSLIM COMMUNITIES QUESTION FEDERAL GOVERNMENT'S "COUNTERING VIOLENT EXTREMISM" PROGRAMS AS ILL-CONCEIVED, INEFFECTIVE, AND STIGMATIZING

*Groups Call on Secretary of Homeland Security Jeh Johnson to Heed Failure of Prior Programs That Indiscriminately Targeted American Muslim Communities, to Re-build Community Trust by Ensuring Existing Counter-Terrorism Programs Protect Civil Liberties, and to Refrain from Religious Targeting*

**LOS ANGELES** – We the undersigned community-based and advocacy organizations that serve American Muslim and other impacted communities in Southern California urge Secretary Jeh Johnson and the Department of Homeland Security (DHS) to address our grave concerns regarding the government's proposed Countering Violent Extremism (CVE) programs. Several months ago, Attorney General Holder announced that the government would establish pilot CVE programs in three cities across the country, including Los Angeles. DHS has already spent an unknown amount of federal resources to lay the groundwork for this program in advance of today's meeting with Secretary Johnson.

While we appreciate the invitation to meet with DHS in the last several weeks, and with Secretary Johnson today, we have serious reservations regarding the program while the government has failed to provide us or the communities we serve with any meaningful details about the CVE programs they intend to implement.

What little we know about the program – that it seeks to encourage individuals in American Muslim communities to intervene with and report to law enforcement "suspect" expressions and behavior of others in their communities – leaves us very disturbed about the obvious civil liberties implications on members of our communities. As described here, Southern California's past experience with similar misguided post 9/11 anti-terrorisms programs that indiscriminately targeted large swaths of our communities as suspect leaves us highly skeptical about their effectiveness. While we, like the vast majority of Americans, strive to live in communities free of violence and extremism, we cannot in good conscience sanction programs that are discriminatory and appear so rife with the possibility of subjecting members of our communities to unwarranted scrutiny and abuse.

As a result, we have serious unanswered questions about the nature of the CVE program, including the following: (1) Why did the government target Los Angeles, Boston, and Minneapolis as the target cities for the CVE initiative? (2) What steps will be taken to ensure that the CVE program does not target protected religious and political expression within our communities? (3) What analysis has the government done to assess the effectiveness of any CVE programs, including in other countries like the U.K.? (4) How much money has been allocated for the CVE initiative and into what programs is that money being directed? (5) Has the government contracted with local municipalities to implement CVE programs and if so, what role will municipalities play?

**Exhibit 2**
**28**

The government's lack of transparency on these basic questions despite its many convenings with groups like ours makes it particularly difficult to trust the program. We further cannot support the introduction of the CVE program into our communities for the following reasons.

**The Context of the CVE Program**

We understand this program against the backdrop of the over decade-long history of the federal government's intrusive surveillance on mosque communities and American Muslims more generally, absent evidence of their engaging in any criminal activity. The FBI has targeted mosques and community organizations in Southern California for intelligence gathering, it has used informants to infiltrate community spaces, and it has pressured law-abiding community members to become informants. When our communities have learned and inquired about these activities, FBI officials have lied to us – specifically in response to questions about these surveillance tactics against sacred Muslim institutions. When these programs have nevertheless been revealed and challenged in court, the government has invoked its need for secrecy to prevent transparency. Even to this day, the federal government remains unwilling to ban religious profiling in national security investigations, continuing to treat an individual's religion as a suspect characteristic.

DHS may argue that CVE programs are an alternative to the FBI's discredited historic approach. However, the fact that DHS was often working hand in hand with the FBI on its over-reaching investigations through fusion centers, joint terrorism task forces, and terrorism watch lists, renders its attempt to distance itself from FBI surveillance tactics not credible. In light of the failure of the federal government at any level to ensure safeguards against religious profiling, we cannot help but believe that CVE programs will open the doors to further profiling of American Muslims and other impacted communities.

**The Selective Nature of CVE and its Impact**

Many community members we have spoken with are deeply concerned about the past actions of law enforcement in Southern California as described above, which leads them to believe that any CVE program will specifically target, stigmatize, and infringe upon the protected rights of Muslim community members in Southern California.

These misgivings are reinforced by the absence of CVE-type programs to combat other forms of extremism in other communities, e.g. white supremacists and anarchists in white communities. Despite the government's acknowledgement that violent extremism is a phenomenon that is not unique to American Muslim communities, the government's CVE program remains focused solely on American Muslim communities.[1] This is so despite evidence that since the 9/11 attacks, "extremists affiliated with a variety of far-right wing ideologies...have killed more people in the United States than have extremists motivated by al-Qaeda's ideology."[2]

As former FBI Special Agent Michael German observed on October 9, 2014, "There were no DHS or [DOJ] CVE programs, for example, directed to white, Christian communities after former Ku Klux Klansman Frazier Glenn Miller murdered people at a Jewish community center last April, even though West Point's Combatting Terrorism Center reported that far right extremists attack and kill more Americans than any other terror groups."[3] Similarly, no equivalent program was announced after "sovereign citizens" gunned down two Louisiana Sherriff's deputies in 2012. By focusing CVE programs on American Muslim communities, the government makes the baseless

---

[1] "Although the [Strategic Implementation Plan] will be applied to prevent all forms of violent extremism, we will prioritize preventing violent extremism and terrorism that is inspired by al-Qa'ida and its affiliates and adherents…" http://www.whitehouse.gov/sites/default/files/sip-final.pdf  "Communities – especially Muslim American communities whose, children, families and neighbors are being targeted for recruitment by al-Qa'ida – are often best positioned to take the lead because they know their communities best." http://www.whitehouse.gov/sites/default/files/empowering_local_partners.pdf
[2] http://edition.cnn.com/2014/04/14/opinion/bergen-sterman-kansas-shooting/
[3] http://www.brennancenter.org/analysis/stigmatizing-boston-muslim-community-no-way-build-trust

www.advancingjustice-la.org

**Exhibit 2**
**29**

insinuation that American Muslims are responsible for more violence than others, and the faulty conclusion that members of their communities have a greater responsibility for countering such violence.

Making intelligence decisions based on religious and political beliefs also results in a misuse of public resources. The CVE program is not the first time we have seen this. The DHS's partnership with local law enforcement to gather information on "suspicious activity" was harshly criticized as a massive waste of resources by the bipartisan Senate Permanent Subcommittee on Investigations in 2012. As Senator Tom Coburn stated, "fusion centers that were designed to share information in a post-9/11 world have become part of the problem. Instead of strengthening our counterterrorism efforts, they have too often wasted money and stepped on Americans' civil liberties."[4]

The selective targeting and gross generalizations of Muslims and those perceived as Muslims reinforces the likelihood that they will be the subject of discrimination in the employment, public sector, and education arenas. We are particularly concerned about the impact of these programs on our youth—their growth and development as citizens and their ability to be civically engaged in important political and ideological discussions.  The infringement of free speech rights on campuses, and the bullying and harassment of Muslims and those perceived as Muslim, which have been well-documented with the Department of Education in recent years, is a consequence of the continued criminalization of Muslims and other people of color through programs such as this.

**Policing Ideology and Constitutionality**

Our concerns regarding the selective targeting of Muslims for the CVE program should not be construed as a call for more CVE programs in other communities; in fact, one of our primary concerns about CVE is that it is not the place of government to determine what ideologies or religious opinions are problematic, and it involves tactics not grounded in targeting criminal activities that are problematic as applied to any group. Police and the intelligence community should follow proven criminal law enforcement standards and involve themselves only where there is actual evidence of criminal activity, and not on the faulty premise that an entire community is suspect by association.

The information presented by the government to date on possible CVE interventions suggests that constitutionally-protected activities may make a person the subject of law enforcement scrutiny.  For example, Lisa Monaco, the Assistant to the President for Homeland Security and Counterterrorism, suggested that the CVE program could lead to law enforcement scrutiny if religious leaders report "unexpected clashes over ideological differences" at mosques or teachers report "a student expressing an interest in traveling to a conflict zone overseas." These examples suggest that the government seeks to use the CVE program to not only determine which ideological leanings are "good" or "bad," but turn religious leaders, teachers, and other community members into monitors of their fellow members' protected religious and speech activities.[5]

Because the government has failed to establish clear rules protecting First Amendment activity and privacy interests in the CVE context, individuals eager to intervene or assist law enforcement are likely to over-report on the political opinions and religious beliefs of others—information that the federal government has used in the past to surveill and prosecute members of our community, even though they were not involved in any violent activity.

**Recommendations**

---

[4] The committee's report found that "DHS's involvement with fusion centers appeared not to have yielded timely, useful, terrorism-related intelligence for the federal intelligence community," and, remarkably, that "[d]espite reviewing 13 months' worth of reporting originating from fusion centers from April 1, 2009 to April 30, 2010, the Subcommittee investigation could identify no reporting which uncovered a terrorist threat, nor could it identify a contribution such fusion center reporting made to disrupt an active terrorist plot." Information on the report is available at http://www.hsgac.senate.gov/subcommittees/investigations/media/investigative-report-criticizes-counterterrorism-reporting-waste-at-state-and-local-intelligence-fusion-centers.

[5] Ms. Monaco's comments are available at http://www.whitehouse.gov/the-press-office/2014/04/16/remarks-assistant-president-homeland-security-and-counterterrorism-lisa-.

www.advancingjustice-la.org

**Exhibit 2**
**30**

It is our recommendation that the government stop investing in CVE programs that will only stigmatize and marginalize our communities further, and instead assist our communities to become more fully engaged participants in our democratic system, including by doing the following:

- The government should stop focusing its efforts to counter violence on Muslim communities, but simply target violent activity generally, regardless of its ideological origins;

- The government should stop undermining our leadership development, civic engagement, and youth empowerment work through its continued use of informants, surveillance, profiling, travel scrutiny, immigration delays, and criminalization of our communities;

- The government should declare that it no longer considers religion a valid basis to consider an individual as a target for law enforcement suspicion in national security investigations.

We urge the government to heed the lessons of our history. Targeting communities based on their faith or national origin raises serious moral and constitutional concerns. As a country we have learned from the unjust and traumatic internment of Japanese Americans and the targeting of civil rights leaders through COINTELPro that we are at our weakest as a nation when we violate our own moral and legal authority in response to overbroad national security concerns. Like all other communities, we cannot guarantee that no person or organization will usurp our faith and ethnic identities, or manipulate legitimate foreign policy grievances, to justify horrendous acts of violence.  We fully recognize that we live in times rife with conflict and grotesque acts of cruelty.  In such times it is even more important that our government not descend into marginalizing and stigmatizing communities, whose active participation in our democratic landscape we should be prepared to value and defend.

*Council on American-Islamic Relations, Greater Los Angeles Area*
*Asian Americans Advancing Justice—Los Angeles*
*American Civil Liberties Union of Southern California*
*Sikh American Legal Defense and Education Fund—Los Angeles*
*Islamic Shura Council of Southern California*

# # #

*Asian Americans Advancing Justice - Los Angeles is the nation's largest Asian American, Native Hawaiian and Pacific Islander (AANHPI) legal and civil rights organization and serves more than 15,000 individuals and organizations every year. Founded in 1983 as the Asian Pacific American Legal Center, Advancing Justice - LA's mission is to advocate for civil rights, provide legal services and education, and build coalitions to positively influence and impact Asian Americans and Pacific Islanders and to create a more equitable and harmonious society. Through direct legal services, impact litigation, policy analysis and advocacy, leadership development and capacity building, Advancing Justice - LA seeks to serve the most vulnerable members of the AANHPI community while also building a strong AANHPI voice for civil rights and social justice.*



**Exhibit 2**
**31**

# EXHIBIT 3

**VIA CERTIFIED MAIL**

July 6, 2017

**TO:**

Jonathan Cantor
Acting Chief Privacy Officer/Chief FOIA
Officer
The Privacy Office
U.S. Department of Homeland Security
245 Murray Lane SW
STOP-0655
Washington, DC 20528-0655

David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
170 Marcel Drive
Winchester, VA 22602-4843

U.S. Department of Homeland Security
Los Angeles Field Office
300 North Los Angeles St. Room 7631
Los Angeles, CA 90012

Deirdre Fike, Assistant Director in Charge
Federal Bureau of Investigation
Los Angeles Field Office
11000 Wilshire Boulevard
Suite 1700
Los Angeles, CA 90024

U.S. Department of Homeland Security
Los Angeles Field Office
501 West Ocian Boulevard, Suite 7200
Long Beach, CA, 90802

Dorothy Lee
Government Information Specialist
Office of Justice Programs
Department of Justice
Room 5400, 810 7th Street, N.W.
Washington, DC 20531

Laurie Day
Chief, Initial Request Staff
Office of Information Policy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, DC 20530-0001

Chaun E. Eason, FOIA Officer
Legal Division
Office of Community Oriented Policing
Services
Department of Justice
Two Constitution Square
145 N Street. N.E., #11E 1405
Washington, DC 20530-0001

**Exhibit 3**
**32**

FOIA/PA Mail Referral Unit
Department of Justice
Room 115
LOC Building
Washington, DC 20530-0001

Kevin Krebs
Assistant Director, FOIA/Privacy Unit
Executive Office for United States
Attorneys
Department of Justice
Room 7300, 600 E Street, N.W.
Washington, DC 20530-0001

FEMA Information Management Division
FOIA Request
500 C Street, S.W., Mailstop 3172
Washington, DC 20472

**FROM:**

Asian Americans Advancing Justice – Los
Angeles
c/o Laboni Hoq
1145 Wilshire Blvd.
Los Angeles, CA 90017

Council on American-Islamic Relations
Greater Los Angeles Area Chapter
c/o Masih Fouladi
2180 W. Crescent Ave., Suite F
Anaheim, CA 92801

Vigilant Love Coalition
c/o Sahar Pirzada
1145 Wilshire Blvd.
Los Angeles, CA 90017

ACLU Foundation of Southern California
c/o Ahilan Arulanantham
131 W. 8th St.
Los Angeles, CA 90017

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

2 of 14

**Exhibit 3**
**33**

Re: *Request Under Freedom of Information Act*

To Whom It May Concern:

  This is a Freedom of Information Act ("FOIA") request (the "Request") submitted to the U.S. Department of Homeland Security ("DHS"), including but not limited to the Federal Emergency Management Agency ("FEMA"), and U.S. Department of Justice ("DOJ"), including but not limited to the Federal Bureau of Investigation ("FBI"), (collectively, the "Agencies") for copies of records, documents, exhibits, applications, and notices related to the Countering Violent Extremism ("CVE") Grant Program.  This Request is made by Asian Americans Advancing Justice – Los Angeles ("Advancing Justice - LA")[1], the Council on American-Islamic Relations of California ("CAIR-CA")[2], the Vigilant Love Coalition ("Vigilant Love")[3], and the American Civil Liberties Union of Southern California ("ACLU SoCal")[4] (collectively, the "Requesters") pursuant to 5

---

[1]  Asian Americans Advancing Justice – Los Angeles is a 501(c)(3) nonprofit organization whose mission is to advocate for civil rights, provide legal services and education, and build coalitions to positively influence and impact Asian Americans, Native Hawaiians, and Pacific Islanders and to create a more equitable and harmonious society.  Founded in 1983 as the Asian Pacific American Legal Center, Advancing Justice-LA serves more than 15,000 individuals and organizations every year through direct services, impact litigation, policy advocacy, leadership development, and capacity building.

[2]  The Council on American-Islamic Relations ("CAIR") is a 501(c)(3) nonprofit, grassroots civil rights and advocacy organization.  CAIR is America's largest Muslim civil liberties organization, with affiliate offices nationwide, including CAIR-CA.  Its mission is to enhance understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims, and build coalitions that promote justice and mutual understanding.  CAIR-CA has offices in the Greater Los Angeles, San Francisco, Sacramento and San Diego areas.

[3]  Vigilant Love is a coalition of allies using the power of solidarity and #VigilantLOVE to actively defend the safety and justice of the communities and individuals affected by Islamophobia in the Greater Los Angeles Area.  Vigilant Love is a community-based, grassroots coalition where community voices can be heard, validated, and translated into collective action.

[4]  ACLU SoCal is a branch of the American Civil Liberties Union and the American Civil Liberties Union Foundation (together, the "ACLU").  The American Civil Liberties Union Foundation is a 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, educates the public about the civil rights and civil liberties implications of pending and proposed state and federal legislation, provides analyses of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators.  The American Civil Liberties Union is a separate nonprofit 501(c)(4) membership

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

**Exhibit 3**
**34**

U.S.C. § 552 *et seq*.  The Requesters ask that you direct this request to all appropriate officials, agencies, offices, components, and/or departments within the Agencies.

## I.      BACKGROUND

In 2011, the White House released a Strategic Implementation Plan with the "overarching goal of preventing violent extremists and their supporters from inspiring, radicalizing, financing or recruiting individuals or groups in the United States to commit acts of violence."[5]  The plan describes federal support for "community-led efforts to build resilience to violent extremism" and "preventative programming," and it identifies three "areas of priority action":

> (1) enhancing Federal engagement with and support to local communities that may be targeted by violent extremists; (2) building government and law enforcement expertise for preventing violent extremism; and (3) countering violent extremist propaganda while promoting our ideals.[6]

In September 2014, Attorney General Eric Holder announced a CVE pilot program, the stated intent of which is to "bring together community representatives, public safety officials, religious leaders, and United States Attorneys to improve local engagement; to counter violent extremism; and—ultimately—to build a broad network of community partnerships to keep our nation safe."[7]

In February 2015, the White House convened a three-day summit on CVE.  The summit focused on "the drivers and indicators of radicalization and recruitment to violence"; methods of "directly addressing and countering violent extremist recruitment

---

organization that educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analyses of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators.

[5]      Office of the President, *Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States* 1-2 (Dec. 2011), https://obamawhitehouse.archives.gov/sites/default/files/sip-final.pdf.  The Strategic Implementation Plan defines "violent extremists" as individuals who support or commit ideologically motivated violence to further political goals."  *Id.* at 1 n.1.

[6]      *Id.* at 2, 7, 10.

[7]      Press Release, *Attorney General Holder Announces Pilot Program to Counter Violent Extremists* (Sept. 15, 2014), http://goo.gl/1TIzfC.

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

**Exhibit 3**
**35**

narratives"; and "empowering community efforts to disrupt the radicalization process."[8] The White House announced that it would be seeking $15 million in appropriated funding for "community-led" CVE efforts and that it had already awarded nearly $3.5 million in grants through the National Institute of Justice "to address domestic radicalization to violent extremism."[9]

In December 2015, Congress allocated $10 million for DHS's Office of Community Partnerships to administer the CVE Grant Program—specifically, to "provide[] on a competitive basis directly to states, local governments, tribal governments, nonprofit organizations, or institutions of higher education" to "prepare for, prevent, and respond to emergent threats from violent extremism."

FEMA has been tasked with, *inter alia*, administering the CVE Grant Program, soliciting and evaluating applications, and monitoring the program.[10]  In July 2016, DHS posted a "Notice of Funding Opportunity" ("NOFO") for the Fiscal Year 2016 CVE Grant Program.[11]  The NOFO solicited applications—to be submitted no later than September 6, 2016—from states, local governments, tribal governments, nonprofit organizations, and higher education institutions.[12]  The NOFO identified "five focus areas for eligible activities that current research . . . has shown to be likely to be the most effective in countering violent extremism," namely: (1) "[d]eveloping resistance"; (2) "[t]raining and engaging with community members"; (3) "[m]anaging intervention activities"; (4) "[c]hallenging the narrative; and (5) "[b]uilding capacity of community-level non-profit organizations active in CVE."[13]  The NOFO further provided, "Applications which describe programs[,] projects or activities which do not appropriately protect privacy, civil rights or civil liberties will be deemed ineligible for funding."[14]

---

[8]     The White House, *Fact Sheet: The White House Summit on Countering Violent Extremism* (Feb. 18, 2015), http://goo.gl/X1bnHk.

[9]     *Id.*

[10]     *See* U.S. Dep't of Homeland Security, *Fact Sheet: FY 2016 Countering Violent Extremism (CVE) Grants* (July 6, 2016), https://www.dhs.gov/news/2016/07/06/fy-2016-countering-violent-extremism-cve-grants.

[11]     U.S. Dep't of Homeland Security, DHS-16-OCP-132-00-01, *Notice of Funding Opportunity: Fiscal Year 2016 Countering Violent Extremism (CVE) Grant Program* 5, https://www.fema.gov/media-library-data/1467814173660-58024ff00713060a31e54a2b0b54deb9/FY16_CVE_NOFO_Final.pdf.

[12]     *Id.* at 4-5.

[13]     *Id.* at 3-4.

[14]     *Id.* at 5.

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

5 of 14

**Exhibit 3**
**36**

On January 13, 2017, the DHS Office of the Press Secretary released a "Statement by Secretary Jeh Johnson Announcing First Round of DHS's Countering Violent Extremism Grants."  The statement read in part:

> A total of 31 proposals, from various organizations in multiple communities, have been accepted to receive some part of the $10 million appropriated by Congress last year.  The funding will go for activities that include intervention, developing resilience, challenging the narrative, and building capacity.  The organizations approved for grants include local governments, universities, and non-profit organizations, in locations across the country such as Boston, Minneapolis, Los Angeles, Detroit, Nebraska, Houston, Illinois, New Jersey, Texas and New York City.  Among the awardees are organizations devoted specifically to countering ISIL's recruitment efforts in our homeland, and Life After Hate, an organization devoted to the rehabilitation of former neo-Nazis and other domestic extremists in this country.[15]

The statement identified 31 grantees, as listed below in Table 1.

### Table 1.  CVE Grant Program Grantees Identified in Jan. 13 DHS Statement.[16]

| Focus Area | Grantee Name | Grant Amount | Service Area |
|---|---|---|---|
| Challenging the Narrative | America Abroad Media | $647,546 | Nationwide |
| Training and Engagement | City of Arlington, Police | $47,497 | Arlington, Texas |
| Training and Engagement | City of Dearborn Police Department | $51,521 | Dearborn, Michigan |
| Training and Engagement | City of Houston, Mayor's Office of Public Safety & Homeland Security | $400,000 | Houston |
| Managing Interventions | City of Los Angeles, Mayor's Office of Public Safety | $425,000 | Los Angeles |
| Training and Engagement | City of Los Angeles, Mayor's Office of Public Safety | $400,000 | Los Angeles |

---

[15]     U.S. Dep't of Homeland Security Office of the Press Secretary, *Statement by Secretary Jeh Johnson Announcing First Round of DHS's Countering Violent Extremism Grants* (Jan. 13, 2017), https://www.dhs.gov/news/2017/01/13/statement-secretary-jeh-johnson-announcing-first-round-dhss-countering-violent [hereinafter "Jan. 13, 2017 DHS Statement"].

[16]     *Id.*

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

6 of 14

**Exhibit 3**
37

| Building Capacity | Claremont School of Theology | $800,000 | Los Angeles |
| Developing Resilience | Coptic Orthodox Charities | $150,000 | Nationwide |
| Building Capacity | Counter Extremism Project | $298,760 | New York |
| Managing Interventions | Crisis Intervention of Houston, Inc. | $400,000 | Houston |
| Training and Engagement | Denver Police Department | $240,000 | Denver |
| Training and Engagement | Global Peace Foundation | $150,000 | New Jersey |
| Developing Resilience | Heartland Democracy Center | $165,435 | Minneapolis |
| Training and Engagement | Illinois Criminal Justice Information Authority | $187,877 | Illinois |
| Developing Resilience | Ka Joog Nonprofit Organization | $499,998 | Minneapolis |
| Managing Interventions | Las Vegas Metropolitan Police Department | $425,000 | Las Vegas |
| Developing Resilience | Leaders Advancing and Helping Communities | $500,000 | Dearborn, Michigan |
| Managing Interventions | Life After Hate Inc. | $400,000 | Nationwide |
| Challenging the Narrative | Masjid Muhammad, Inc. | $450,000 | Nationwide |
| Developing Resilience | Music in Common | $159,000 | Nationwide |
| Challenging the Narrative | Muslim American Leadership Alliance | $40,000 | Nationwide |
| Managing Interventions | Muslim Public Affairs Council Foundation | $393,800 | Nationwide |
| Training and Engagement | National Consortium for Advanced Policing | $200,000 | Nationwide |
| Training and Engagement | Nebraska Emergency Management Agency | $300,000 | Nebraska |
| Developing Resilience | Peace Catalyst International | $95,000 | Nationwide |
| Developing Resilience | Police Foundation | $463,185 | Boston |
| Challenging the Narrative | Project Help Nevada, Inc. | $150,000 | Reno, Nevada |
| Challenging the Narrative | Rochester Institute of Technology | $149,955 | Nationwide |
| Challenging the Narrative | The University of North Carolina at Chapel Hill | $866,687 | Nationwide |
| Developing Resilience | Tuesday's Children | $147,154 | Nationwide |
| Challenging the Narrative | Unity Productions Foundation | $396,585 | Nationwide |

On June 23, 2017, the DHS Office of the Press Secretary released a statement titled "DHS Awards Grants to Counter Terrorist Recruitment and Radicalization in the U.S."[17]  The statement announced, "DHS [had] awarded $10 million to 26 local law

---

[17]     U.S. Dep't of Homeland Security Office of the Press Secretary, *DHS Awards Grants to Counter Terrorist Recruitment and Radicalization in the U.S.* (June 23, 2017),

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

**Exhibit 3**
38

enforcement and community organizations."[18]  The statement provided a link to a webpage listing the 26 grantees.[19]  The statement also read:

> "We are witnessing a global surge in terrorist activity, and in many ways our own backyard has become the battleground," said Secretary of Homeland Security John F. Kelly.  "That is why DHS is focused on stepping up efforts to counter terrorist recruitment and radicalization, including through close collaboration with state and local partners. Shortly, after starting at DHS, I requested a thorough policy review of the CVE Grant Program to ensure taxpayer dollars go to programs with the highest likelihood of success, that support the men and women on the front lines of this fight, and that can be self-sustaining into the future. We will closely monitor these efforts to identify and amplify promising approaches to prevent terrorism."[20]

The June 23 List was significantly different from the list of grantees provided in the Jan. 13 DHS Statement.  First, eleven grantees identified in the Jan. 13 DHS Statement were not included in the June 23 List.[21]  These entities were:

- Claremont School of Theology;
- Coptic Orthodox Charities;
- Ka Joog Nonprofit Organization;
- Leaders Advancing and Helping Communities;
- Life After Hate Inc.;
- Music in Common;
- Muslim American Leadership Alliance;
- Muslim Public Affairs Council Foundation;
- Project Help Nevada, Inc.;

---

https://www.dhs.gov/news/2017/06/23/dhs-awards-grants-counter-terrorist-recruitment-and-radicalization-us [hereinafter "June 23, 2017 DHS Statement"].

[18]     *Id.*

[19]     *See id.*; U.S. Dep't of Homeland Security, *DHS Countering Violent Extremism Grants* (June 23, 2017), https://www.dhs.gov/cvegrants [hereinafter "June 23 List"].

[20]     *Id.*  News reports indicated that DHS was contemplating focusing CVE efforts exclusively on countering Islamic radicalization.  *See, e.g.*, Julia Edwards Ainsley *et al.*, *Exclusive: Trump to focus counter-extremism program solely on Islam - sources*, Reuters (Feb. 2, 2017), http://www.reuters.com/article/us-usa-trump-extremists-program-exclusiv-idUSKBN15G5VO.

[21]     *Compare* Jan. 13 DHS Statement *with* June 23 List.

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

**Exhibit 3**
**39**

- The University of North Carolina at Chapel Hill; and
- Unity Productions Foundation.[22]

Second, the Jan. 13 DHS Statement indicated that the City of Los Angeles, Mayor's Office of Public Safety ("Los Angeles Mayor's Office") would receive two grants: one grant in the Training and Engagement focus area and another grant in Managing Interventions.  The June 23 List indicated that the Los Angeles Mayor's Office would receive only one grant in Managing Interventions.  Third, the June 23 List indicated that the grant amounts for nine grantees had been increased, as compared to the grant amounts specified in the Jan. 13 DHS Statement.  The increased funding is reflected below in Table 2.

**Table 2.  Grantees with Increased Funding in June 23 List[23]**

| Focus Area | Grantee Name | Change in Funding |
|---|---|---|
| Training and Engagement | City of Houston, Mayor's Office of Public Safety & Homeland Security | Increased from $400,000 to $500,000 |
| Managing Interventions | Crisis Intervention of Houston, Inc. | Increased from $400,000 to $500,000 |
| Training and Engagement | Denver Police Department | Increased from $240,000 to $481,313 |
| Training and Engagement | Global Peace Foundation | Increased from $150,000 to $453,497 |
| Developing Resilience | Heartland Democracy Center | Increased from $165,435 to $423,340 |
| Managing Interventions | Las Vegas Metropolitan Police Department | Increased from $425,000 to $500,000 |

---

[22]　　News reports indicate that the current administration withdrew the CVE grants awarded to Muslim Public Affairs Council, Life After Hate Inc., and the University of North Carolina at Chapel Hill by the previous administration.  Bethany Allen-Ebrahimian, *DHS Strips Funding From Group That Counters Neo-Nazi Violence*, Foreign Policy (June 26, 2017), http://foreignpolicy.com/2017/06/26/dhs-strips-funding-from-group-that-counters-neo-nazi-violence/; Daniel Lippman, *DHS halts planned funding for anti-white extremism group*, Politico (June 23, 2017), http://www.politico.com/story/2017/06/23/playbook-dhs-extremism-life-after-hate-239889; Jay Price, *Trump Administration Removes UNC From Anti-Extremism Program*, WUNC (June 23, 2017), http://wunc.org/post/trump-administration-removes-unc-anti-extremism-program#stream/0.  News outlets also reported that several groups declined to accept their CVE grants.  *See, e.g.*, Stephen Montemayor, *Homeland Security announces two counterextremism grants for Minnesota*, Star Tribune (June 24, 2017), http://www.startribune.com/homeland-security-announces-two-extremism-grants-for-minnesota/430455753/ (reporting that Ka Joog declined to accept CVE grant).

[23]　　*Compare* Jan. 13 DHS Statement *with* June 23 List.

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017　**T** 213-977-7500　**F** 213-977-7595　www.advancingjustice-la.org

**Exhibit 3
40**

| Challenging the Narrative | Masjid Muhammad, Inc. | Increased from $450,000 to $531,195 |
|---|---|---|
| Developing Resilience | Police Foundation | Increased from $463,185 to $484,835 |
| Developing Resilience | Tuesday's Children | Increased from $147,154 to $386,670 |

Fourth, the June 23 List included seven new grantees, which had not been identified in the Jan. 13 DHS Statement, as indicated below in Table 3.

**Table 3.  New Grantees in June 23 List.[24]**

| Focus Area | Grantee Name | Grant Amount | Service Area |
|---|---|---|---|
| Managing Interventions | Alameda County Sheriff's Office | $499,125 | Alameda, California |
| Training and Engagement | Hennepin County Sheriff's Office | $347,600 | Minneapolis |
| Managing Interventions | Massachusetts Executive Office of Public Safety and Security | $500,000 | Massachusetts |
| Developing Resilience | Nashville International Center for Empowerment | $445,110 | Nashville |
| Training and Engagement | National Governors Association (NGA) Center for Best Practices | $500,000 | Nationwide |
| Developing Resilience | Seattle Police Department | $409,390 | Seattle |
| Building Capacity | University of San Diego | $634,769 | San Diego |

## II.    FORMAL REQUEST

For the purposes of this request, "Records" are collectively defined to include, but are not limited to: text communications between phones or other electronic devices (including, but not limited to, communications sent via SMS or other text messaging services, such as Blackberry Messenger, iMessage, WhatsApp, Signal, Google Hangouts, and Twitter direct messaging); e-mails; images, video, and audio recorded on cellular phones or similar devices; voicemail messages; social media posts; instructions; directives; guidance documents; formal and informal presentations; training documents; bulletins; alerts; updates; advisories; reports; legal and policy memoranda; contracts or agreements; minutes or notes of meetings and phone calls; and formal and informal memoranda of any kind.

We request the release of the following:

---

[24]        *Compare* Jan. 13 DHS Statement *with* June 23 List.

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

**Exhibit 3**
**41**

(1)      Records of all communications with any and all entities that considered submitting applications to the CVE Grant Program;

(2)      Records of all communications with any and all entities that submitted applications to the CVE Grant Program, including but not limited to copies of all grant applications;

(3)      Records identifying all entities that submitted grant applications to the CVE Grant Program;

(4)      Records of all applications and any supporting documentation submitted by any entity seeking a grant under the CVE Grant Program;

(5)      Records, including but not limited to all directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, referring or relating to any federal agency official's evaluation of applications submitted to the CVE Grant Program;

(6)      Records created, referenced, or relied on in connection with DHS's "thorough policy review of the CVE Grant Program" as set forth in the June 23, 2017 DHS Press Statement referenced above.

(7)      Records, including but not limited to directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, concerning any re-evaluation or changes to how CVE Grant Program applications should be evaluated by relevant federal agency officials since the Trump administration took office;

(8)      Records, including but not limited to directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, referring or relating to any review, re-evaluation or change in the federal government's position, approach, focus, or priorities relating to CVE under the Trump administration;

(9)      Records, including but not limited to directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, referring or relating to the federal government's withdrawal of grants it awarded under the CVE Grant Program from any and all entities identified as CVE Grant Program awardees in the "Statement by Secretary Jeh Johnson Announcing First Round of DHS's Countering Violent Extremism Grants," dated January 13, 2017, including but not limited to Records pertaining to the withdrawal of grants awarded to Claremont School of Theology; Coptic Orthodox Charities; Ka Joog Nonprofit Organization; Leaders Advancing and Helping Communities; Life After Hate Inc.; Music

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

11 of 14

**Exhibit 3**
42

in Common; Muslim American Leadership Alliance; Muslim Public Affairs Council Foundation; Project Help Nevada, Inc.; The University of North Carolina at Chapel Hill; and Unity Productions Foundation;

(10)     Records, including but not limited to directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, referring or relating to the increase in grant amounts for certain entities, including but not limited to the grantees listed in Table 2 above;

(11)     Records, including but not limited to directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, referring or relating to grants to new awardees listed in the June 23 List, including but not limited to Records pertaining to grants awarded to the entities listed in Table 3 above;

(12)     Records reflecting the processing, review, evaluation and/or re-evaluation of applications submitted to the CVE Grant Program, including but not limited to Records identifying the individuals, agencies, and/or entities that processed, reviewed, evaluated and/or re-evaluated the applications; and Records reflecting comments, opinions, notes, and/or other writings concerning each application submitted to the CVE Grant Program;

(13)     Records including but not limited to directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, referring or relating to the monitoring, evaluation, re-evaluation and/or performance measurement of the CVE Grant Program, as a whole and/or with respect to any of its component parts, including but not limited to recipients of funding from the CVE Grant Program;

(14)     Records of all exchange of information, including but not limited to directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, referring or relating to any and all meetings, convenings, conferences, conversations, correspondence, and communications between any federal agency and any professors, scholars, consultants, experts, specialists, and/or any individual purporting to possess knowledge or expertise about countering violent extremism;

(15)     Records of all exchange of information, including but not limited to directives, memoranda, communications, memoranda of understanding, training documents, bulletins, reports, meetings, or guidance, referring or relating to any and all meetings, convenings, conferences, conversations, correspondence, and communications between any federal agency and any state or local government agencies who sought

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

12 of 14

**Exhibit 3**
**43**

and/or received any federal funding relating to CVE and/or related, similar or rebranded programs; and

(16)    Any other Records referring or relating to the CVE Grant Program.

## III.    REQUEST FOR WAIVER OF ALL FEES

The Requesters request a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understand of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).  The Requesters are nonprofit, public interest organizations whose primary interest is to obtain information to further the public's understanding of the CVE Grant Program.  The Requesters are not filing this Request to further their commercial interests.  Any information disclosed as a result of this Request will be made available to the public at no cost.  Thus, a fee waiver would fulfill Congress's legislative intent in amending the FOIA.

## IV.    REQUEST FOR EXPEDITED PROCESSING

The Requesters request expedited processing, pursuant to 5 U.S.C. § 552(a)(6)(E).  There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgent[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity."  5 U.S.C. § 552(a)(6)(E)(v)(II).  Specifically, the requested records seek to inform the public about federal agency activities concerning the CVE Grant Program, and in particular any changes to the criteria for making grants.  The public has a right to know this information on expedited basis, as the grants were recently approved and will likely go into effect imminently, resulting in the need to immediately access the requested information in order to understand and educate the public about the impact of the grant programs.

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

**Exhibit 3**
**44**

## V.     CONCLUSION

We appreciate your attention to this matter, and we look forward to receiving your determination regarding our request for expedited processing within ten (10) calendar days.  *See* 5 U.S.C. § 552(a)(6)(E)(ii)(I); 6 C.F.R. § 5.5(d)(4).

If this Request is denied in whole or in part, the Requesters ask the Agencies to justify all withholdings or deletions by reference to specific FOIA exemptions.  The Requesters expect the Agencies to release all segregable portions of otherwise exempt material and reserves the right to appeal a decision to withhold any records or portions of records or to deny the requests for a fee waiver and expedited processing.

Please furnish all applicable records to:

Laboni Hoq
Litigation Director
Asian Americans Advancing Justice – Los Angeles
1145 Wilshire Blvd., 2nd Floor
Los Angeles, CA 90017
lhoq@advancingjustice-la.org

Thank you for your prompt attention to this matter.  I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.  *See* 5 U.S.C. § 552(a)(6)(E)(vi).

Sincerely,

Laboni Hoq
Litigation Director
Asian Americans Advancing Justice – Los Angeles
1145 Wilshire Blvd.
Los Angeles, CA 90017
(213) 977-7500 ext. 257

**Building upon the legacy of the Asian Pacific American Legal Center**
1145 Wilshire Blvd., 2nd Floor, Los Angeles, CA 90017   **T** 213-977-7500   **F** 213-977-7595   www.advancingjustice-la.org

14 of 14

**Exhibit 3**
**45**